Kutak Rock LLP
Geana M. Van Dessel, WSBA #35969
Geana.VanDessel@KutakRock.com
510 W. Riverside Ave., Suite 800
Spokane, Washington 99201-0506
Telephone:  (509) 747-4040

Attorneys for Defendant
Michael Vantiger

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 4:20-CR-6010-SAB |
| v. | Reply Re: Defendant's Motion to Challenge K9 Alert and Suppress |
| MICHAEL VANTIGER, | |
| Defendant. | |

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington  99201-0506
(509) 747-4040

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

## I.    Request for Relief

Mr. Vantiger was illegally seized in violation of his Fourth Amendment rights when the car he was riding in was stopped via an unreasonable and illegal ruse and again when he was detained roadside. Then his Fourth Amendment rights were again violated when the car was subsequently searched without probable cause. The fruits of the illegal actions must be excluded. The Court should exclude Mr. Vantiger's statements, Ms. Gomez' statements, and the evidence seized when the car was searched.

## II.    Argument

**A.    The Government did not have reasonable suspicion sufficient to support the investigatory stop, but even if it did, the ruse used was unreasonable and illegal, and therefore violated Mr. Vantiger's Fourth Amendment rights.**

An investigatory stop is required by the Fourth Amendment to be grounded in reasonable suspicion based on objective facts that the individual is involved in criminal conduct. *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949). An officer must have "more than an inchoate and unparticularized suspicion or 'hunch' . . . ." *Id*.; *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

Here the Government relied on stale evidence to support the 2020 investigatory stop—2018 interviews of CD-1 and CD-2—and without that stale evidence, the remaining evidence does not support more than a hunch that Mr. Vantiger was involved in criminal conduct. The Government ignores this argument in Mr. Vantiger's motion and argues instead, confusingly, that the collective

Defendant's Reply Motion to Challenge K9 and Suppress - 1

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington  99201-0506
(509) 747-4040

1  knowledge doctrine somehow justified the stop. But Mr. Vantiger is not
2  challenging the individual knowledge of the officers conducting the stop. Rather,
3  Mr. Vantiger's motion explained that the information gathered and known to any
4  or all government agents could not be relied on to support reasonable suspicion
5  because without the stale evidence—the 2018 interviews with CD-1 and CD-2—
6  the rest of the evidence amounted to nothing more than a hunch and not reasonable
7  suspicion.

8         The Government also argues that because "multiple search warrants" were
9  granted preceding the traffic stop, the information included in those affidavits gave
10  rise to reasonable suspicion to support the traffic stop and search of the rental
11  vehicle. ECF No. 85-1 at 24. And that "[t]o argue now there was no basis for the
12  stop, would be to argue there was no basis for the issuance of these search warrants
13  wherein a detached Magistrate fund [sic] *probable cause*." ECF No. 85-1 at 25.
14  This argument also misses the point. A valid warrant must establish "a fair
15  probability that contraband or evidence of a crime will be found in a *particular*
16  *place*." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (emphasis added). While the
17  Magistrate determined there was sufficient probable cause to believe that
18  contraband or evidence of a crime would be found in Mr. Vantiger's residence, it
19  <u>does not</u> mean the same evidence establishes reasonable suspicion to conduct an
20  investigatory stop of Ms. Gomez's rental vehicle. Even if the Government had
21  reasonable suspicion to support an investigatory stop, the use of the ruse violated
22

Defendant's Reply Motion to Challenge K9 and Suppress - 2

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington 99201-0506
(509) 747-4040

Mr. Vantiger's Fourth Amendment rights and all statements and evidence must be suppressed.

The Government argues law enforcement "can and should utilize" a ruse to explain a traffic stop in order to preserve an ongoing investigation. ECF No. 85-1 at 26. The Court need not settle that debate, however, because here law enforcement did not use a ruse to preserve an ongoing investigation. Instead, they used an illegal ruse and told Ms. Gomez and Mr. Vantiger that there had been reports of erratic driving and a possible domestic disturbance in the vehicle.[1] "Deception is unlawful when the government makes its identity as law enforcement known to the target of the ruse and exploits the target's trust and cooperation to conduct searches and seizures beyond that which is authorized . . . " *United States v. Ramirez*, 976 F.3d 946, 952 (9th Cir. 2020).

The Government relies on *United States v. Magallon-Lopez*, 817 F.3d 671 (9th Cir. 2016) to argue that law enforcement's lie about the reason for the traffic stop "does not call into question the legality of the stop." ECF No. 85-1 at 26. Mr. Vantiger is not questioning the legality of the stop simply because law enforcement lied to him about the stop. Mr. Vantiger challenges the legality of the stop based on lack of reasonable suspicion *and* challenges the legality of the *ruse* used by law enforcement to gain his trust and cooperation in investigating a possible domestic disturbance.

---

[1] ECF No. 87, Declaration Geana Van Dessel, Ex. A at 16 ("Van Dessel Decl.").

Defendant's Reply Motion to Challenge K9 and Suppress - 3

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington 99201-0506
(509) 747-4040

1    "Law enforcement does not have carte blanche to use deception to effect a

2    search and seizure." *Ramirez*, 976 F.3d at 955. "The court must assess the

3    reasonableness of law enforcement's use of deception by balancing the nature and

4    quality of the intrusion on the individual's Fourth Amendment interests against the

5    importance of the governmental interests alleged to justify the intrusion. *Id*. at 952-

6    953 (internal citation and quotations omitted). The ruse used on Mr. Vantiger and

7    Ms. Gomez trampled on their Fourth Amendment rights in a way that is vastly

8    different than the ruse used in *Magallon-Lopez*.

9    In *Magallon-Lopez*, law enforcement officers investigating an interstate

10    drug-trafficking ring conducted an investigatory stop and informed the driver of

11    the vehicle he had been pulled over for failing to signal properly before changing

12    lanes, even though this was not the real reason for the stop. 817 F.3d at 673-674. A

13    false accusation of committing a minor traffic violation is significantly different

14    than the ruse used against Mr. Vantiger where he was accused of domestic

15    violence—a criminal charge.[2] Mr. Vantiger and Ms. Gomez were compelled to

16    speak with law enforcement to defend themselves against the accusation of

17    criminal conduct. There is no dispute that law enforcement used the domestic

18    disturbance ruse to justify removing Mr. Vantiger and Ms. Gomez from the vehicle

19    and questioning them separately on the side of the road for almost half an hour,

20

21    _____

    [2] A charge of Domestic Violence in Washington is a "serious crime against

22    society." RCW 10.99.010.

Defendant's Reply Motion to Challenge K9 and Suppress - 4

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington 99201-0506
(509) 747-4040

knowing that Mr. Vantiger and Ms. Gomez would be all too willing to assist law enforcement in investigating a domestic disturbance and to exonerate themselves of any criminal wrongdoing. This type of deception is illegal. Further, the use of the ruse was unreasonable because the Government failed to articulate an important governmental interest to justify the intrusion on Mr. Vantiger's Fourth Amendment rights.

Law enforcement's betrayal of Mr. Vantiger's trust to conduct a seizure without probable cause is clearly unreasonable. Absent authority to seize the vehicle and Mr. Vantiger, and absent any vital interest justifying a ruse, the ruse violated Mr. Vantiger's Fourth Amendment rights. All evidence and statements must be suppressed.

**B.** **The Government did not have probable cause to detain Mr. Vantiger and Ms. Gomez or to search the vehicle.**

**1.** **The evidentiary hearing will establish that the K9 alert was unreliable and cannot support probable cause.**

Mr. Vantiger requests an evidentiary hearing to question Det. Corral regarding K9 Ezra's continued training and to call his own K9 expert, Jerry Potter, to testify how K9 Ezra's behavior and his handler's actions during the sweep prove K9 Ezra's alerts were not reliable. The Government argues that Mr. Potter's testimony is "faulty" and urges this Court to reject his testimony because it would be "consistent with how other district court's [sic] have treated his offered opinion." To support these accusations, the Government cites two cases in which

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington  99201-0506
(509) 747-4040

Mr. Potter was a defense K9 expert in a motion to suppress hearing. ECF No. 85-1at 29 (citing *United States v. Aldaco* and *United States v. Yanez Pacheco*).[3] The Government's bold accusation that the court in both cases rejected Mr. Potter's testimony is unfounded.

The *Aldaco* Court found the K9 had exhibited a "behavior change," not an alert, and that although that alone would not constitute probable cause, it did not preclude the court from considering the behavior change with all relevant evidence to establish probable cause. Attachment A (Order Denying Motion to Suppress at 8, *United States v. Aldaco*, Case No. 19-CR-00070-SWS (D. Wyo. July 30, 2019), ECF No. 70). In *Yanez Pacheco*, the district court did not address the reliability of the K9 alert because the court determined there was probable cause to search the car without regard to the K9's reactions to the car. Attachment B (Order Denying Defendant's Motion to Suppress Evidence at 10, *United States v. Yanez Pacheco*, No. 4:19-cr-00063-RGE-CFB-1, (S.D. Iowa Sept. 11, 2019), ECF No. 67). Contrary to the government's representation, neither court wholly rejected Mr. Potter's testimony.

Mr. Potter will explain how and why K9 Ezra's alerts were unreliable and cannot support probable cause for Mr. Vantiger's detention or the search of the vehicle.

---

[3] The Government did not supply these opinions, but both are included with this Reply as Attachments.

Defendant's Reply Motion to Challenge K9 and Suppress - 6

Kutak Rock LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington 99201-0506
(509) 747-4040

**2.      All statements and physical evidence must be suppressed because there was no probable cause to detain Mr. Vantiger and Ms. Gomez nor to search the vehicle without the K9 alert.**

A valid warrant must establish "a fair probability that contraband or evidence of a crime will be found in a *particular place*." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (emphasis added). Again, the Government attempts to argue that because other subpoenas and search warrants were granted based off the same evidence contained in the search warrant affidavit for the rental vehicle, that evidence automatically establishes probable cause to search the rental vehicle without the K9 alert. Evidence that established probable cause to search Mr. Vantiger's residence does not *automatically* establish probable cause to search Ms. Gomez's rental vehicle—and the Government knew it—which is why the K9 was deployed to sniff the rental vehicle. Without a reliable K9 alert, there was no probable cause to seize Mr. Vantiger, and thus, he was illegally detained in violation of his Fourth Amendment rights.

The Government contends that even if this Court concludes there was no probable cause without the K9 alert, the Court should admit all evidence under the good faith exception to the exclusionary rule. ECF No. 85-1 at 35. The exclusionary rule is designed to deter police misconduct. *United States v. Leon*, 468 U.S. 897, 916 (1984). The good-faith exception does not apply and suppression "remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id*. at

Defendant's Reply Motion to Challenge K9 and Suppress - 7

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington  99201-0506
(509) 747-4040

922 (emphasis added). An officer's reliance on the judge or magistrate's probable cause determination must be objectively reasonable. *Id*. at 922 (emphasis added).

In the instant case, Det. Corral authored the search warrant affidavit to search the rental vehicle.[4] Det. Corral included the evidence gathered by DEA agents as well as the K9 alert, despite the K9 alert being unreliable. Det. Corral was one of the officers who conducted the search on the rental vehicle.[5] Det. Corral's reckless disregard for K9 Ezra's alert being unreliable and including it in the affidavit for the search warrant does not afford the Government the protection of the good-faith exception to the exclusionary rule because the reliance on the faulty information was not objectively reasonable. Suppression of all evidence and statements obtained from the Government's reliance on the invalid search warrant is the appropriate remedy.

## IV.    CONCLUSION

The Government violated Mr. Vantiger's Fourth Amendment rights when law enforcement used an illegal ruse to stop and seize him, and again when they relied on an unreliable K9 alert to support probable cause to detain him and search the vehicle. The Court should suppress all statements made by Mr. Vantiger and Ms. Gomez to law enforcement and all evidence seized from the search of the vehicle.

---

[4] ECF No. 87, Van Dessel Decl., Ex. A.

[5] *Id*., Ex. B.

Defendant's Reply Motion to Challenge K9 and Suppress - 8

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington  99201-0506
(509) 747-4040

1

Dated: February 19, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

KUTAK ROCK LLP

By:   s/ Geana M. Van Dessel
Geana M. Van Dessel, WSBA #35969
510 W. Riverside Ave., Suite 800
Spokane, WA 99201
(509) 252-2691
Geana.VanDessel@kutakrock.com

Attorneys for Defendant Michael
Vantiger

Defendant's Reply Motion to Challenge K9 and Suppress - 9

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington  99201-0506
(509) 747-4040

1

## **<u>CERTIFICATE OF SERVICE</u>**

2

I certify that on February 19, 2021, I caused the foregoing to be

3

electronically filed with the Clerk of the Court using the CM/ECF System which in

4

turn automatically generated a Notice of Electronic Filing (NEF) to all parties in

5

the case who are registered users of the CM/ECF system. The NEF specifically

6

identifies recipients of electronic notice.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

s/ Geana M. Van Dessel
Geana M. Van Dessel, WSBA #35969
KUTAK ROCK LLP
510 W. Riverside Ave., Ste. 800
Spokane, WA 99201
(509) 747-4040
Geana.VanDessel@KutakRock.com

Attorney for Defendant Michael Vantiger

Defendant's Reply Motion to Challenge K9 and Suppress - 10

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington  99201-0506
(509) 747-4040

1

Attachment A

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
Suite 800
510 West Riverside Avenue
Spokane, Washington  99201-0506
(509) 747-4040

IN THE UNITED STATES DISTRICT COURT

FILED
U.S. DISTRICT COURT
WYOMING

2019 JUL 30 PM 2: 20

FOR THE DISTRICT OF WYOMING

CLERK
CASPER

UNITED STATES OF AMERICA,

        Plaintiff,

VS.

ANDREA ALDACO and ADRIAN
SEVERO REYNA, SR.,

        Defendants,

Case No. 19-CR-0070-SWS

---

## ORDER DENYING MOTION TO SUPPRESS

This matter comes before the Court on Defendants' Motions to Suppress. (ECF Nos. 51, 52). Both Defendants argue there was not reasonable suspicion for a traffic stop nor probable cause to search the vehicle. The Court having considered the motions and briefing, oral argument on the matter, and being otherwise fully advised, finds as follows:

### BACKGROUND

On February 7, 2019, Trooper Petruso stopped a rental vehicle driven by Defendant Reyna in which Defendant Aldaco was a passenger. (ECF No. 51-1). According to the testimony the Trooper stopped the vehicle for failure to signal a lane change. (*Id.* at 7). There is no video of this portion of the stop. (*Id.* at 16). The reasons for this were disputed at the hearings on this matter.

1

Upon stopping the vehicle, Trooper Petruso observed two unrestrained children and the faint odor of marijuana. (*Id.* at 7; ECF No. 51-2 at 16:56:52). Defendant Reyna began opening an air freshener while talking with the Trooper. (ECF No. 51-1 at 7). He visibly places that air freshener on the rear-view mirror during the stop in the dash cam video. (ECF No. 51-2 at 16:55). Reyna indicated they were coming from Wasco, California and going to visit uncles and aunts in Minnesota for a week. (ECF No. 51-1 at 7; 51-2 at 16:56, 17:02). However, Reyna was unable to articulate where in Minnesota they were going or the names of any of the relatives they were visiting despite telling the Trooper he had been there to visit two months ago. (ECF No. 51-2 at 16:57-:58). He also gave an incorrect last name for Aldaco, purportedly his girlfriend of a year. (*Id.* at 16:58:57, 17:02). The car was rented from Long Beach, California. (ECF No. 51-1 at 7). At the time of the stop the vehicle was already a day overdue and due back in Long Beach. (*Id.*; 15-2 at 17:11). Defendant Aldaco roughly confirmed these vague plans. (ECF No. 51-2 at 17:06).

Trooper Petruso then deployed his drug detection K9 Becky.[1] (*Id.*). The Trooper's report and testimony indicates she alerted to the right wheel well. (*Id.*). The defense describes it as "what could be labeled a change in behavior." (ECF No. 52 at 2). The video shows Becky excitedly pawing at the right rear of the vehicle, spinning in circles and demonstrating continuing interest in that particular area. (ECF No. 51-2 at 17:12:32-17:14:17). A subsequent search of the vehicle revealed a duffle bag on the right side of the truck containing 21.7 pounds of methamphetamine. (ECF No. 51-1 at 8). Troopers also

---

[1] Neither Defendant argues the Trooper lacked reasonable suspicion at this point to prolong the stop and run the dog.

2

discovered a glass pipe with methamphetamine residue in the glovebox and suspected marijuana shake on the floor of the vehicle. (*Id.*).

Defendant Aldaco filed a motion to suppress on July 11, 2019. (ECF No. 51). Defendant Reyna filed a motion to suppress the same day. (ECF No. 52). They orally joined in each other's motions at the July 19th hearing. Both Defendants argue there was no reasonable suspicion for the initial stop and no probable cause to search the vehicle. The Government responded on July 16, 2019 at the direction of the Court. (ECF No. 59). The Court heard oral argument on both motions on July 19, 2019 and July 26, 2019. (ECF Nos. 61, 66).

## DISCUSSION

Defendants first[2] argue there was no reasonable suspicion to institute a traffic stop. A traffic stop is a seizure within the meaning of the Fourth Amendment. *United States v. Chavez*, 534 F.3d 1338, 1343 (10th Cir. 2008). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is

---

[2] To the extent there is a question of standing the Court finds both Defendants have standing to challenge the search. Defendant Aldaco rented the car and Defendant Reyna was driving the car at the time of the stop. *See Byrd v. United States*, 138 S. Ct. 1518, 1529 (2018) ("the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy."); *United States v. Walton*, 763 F.3d 655, 661 (7th Cir. 2014); *United States v. Obregon*, 748 F.2d 1371, 1374 (10th Cir. 1984) (renter and authorized driver(s) of rental car have privacy interest in rental car); *United States v. Flores*, No. 2:14-CR-260-RJS, 2015 WL 93866, at *4 (D. Utah Jan. 7, 2015), *aff'd*, 641 F. App'x 817 (10th Cir. 2016) (same). The Court does not find the Government's attempts to distinguish *Byrd* compelling given the broad language of the opinion. As an aside, the Court also notes the fact that the rental car was overdue and being used to transport drugs in violation of the rental agreement does not defeat standing to challenge the stop and search. *See United States v. Jeter*, 394 F. Supp. 2d 1334, 1344–45 (D. Utah 2005), *aff'd*, 175 F. Appx. 261 (10th Cir. 2006).

3

occurring." *United States v. Cervine*, 347 F.3d 865, 870 (10th Cir. 2003); *see also United States v. Legge*, 414 F. Appx. 124, 127 (10th Cir. 2011). "While either probable cause or reasonable suspicion is sufficient to justify a traffic stop, only the lesser requirement of reasonable suspicion is necessary." *United States v. Callarman,* 273 F.3d 1284, 1287 (10th Cir. 2001). To determine if a stop was reasonable the Court relies on the principles of *Terry v. Ohio*, 392 U.S. 1. *See Chavez*, 534 F.3d at 1343. Ultimately, "[w]hen evaluating the reasonableness of the initial stop [of a vehicle], [the] sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Tang*, 332 F. Appx. 446, 449 (10th Cir. 2009).

Both Defendants assert Trooper Petruso lacked reasonable suspicion. (ECF Nos. 51, 52). According to the Trooper's report and testimony, he observed the car move from the far-left lane to the center lane without a proper signal. (ECF No. 51-1). Trooper Petruso relayed this to Defendant Reyna on the dash cam video as the reason for the stop. Failure to appropriately signal would be a violation of Wyoming traffic law. *See* Wyo. Stat. Ann. § 31-5-217*; State v. Juarez*, 2011 WY 110, ¶ 12, 256 P.3d 517, 520 (Wyo. 2011) (interpreting this provision and noting "This Court has found that changing lanes, (moving 'right or left') requires proper signaling."); *State v. Welch*, 873 P.2d 601, 602 (Wyo. 1994) (finding failure to signal at least 100 feet prior to changing lanes under 31-5-217(b) provided reasonable suspicion for traffic stop). If this violation was observed, it justified a traffic stop.

4

Trooper Petruso testified on the purported lack of signaling. However, this portion of the stop was not captured on video due to an alleged power failure. The Trooper's initial testimony on why this video was lost was somewhat weak. He testified he turned his vehicle off and on at the car barn and lost approximately forty seconds of the video, which happens to be the portion that captures the purported traffic violation. He testified he knew of the failure when he wrote the incident report but did not put it in the original report. Trooper Petruso testified he could not remember this power failure issue happening before or since in his vehicle and reported there were no repairs to his car as a result of this incident. There was no contemporaneous documentation of the incident and at best Trooper Petruso reported it verbally to a superior. The Court continued the hearing to receive further testimony on this "power failure" video issue.

The second hearing took place on July 26, 2019. At that time, the Court heard from David Luegering, a Wyoming Highway Patrol equipment specialist. Mr. Luegering credibly testified he had investigated the missing video beginning July 19 and determined the issue to be a failure of the Trooper's pre-record video function[3]. According to a letter obtained from the manufacturer, this failure was a result of the Trooper starting the video recording on the instant stop prior to the video from his previous stop fully buffering.[4] This buffering can take up to thirty-five seconds. This conclusion is corroborated by two things. First, the timing of the video of the stop immediately prior, which ends at 16:51:04, and

---

[3] The pre-record function captures the minute prior to light activation or other camera activation without audio by going back and accessing the always recording video stream.

[4] There is no evidence that Trooper Petruso knew or should have known the prior video was still buffering or intended to hamper the recording of the instant stop.

5

the video of the instant stop which begins at 16:51:36, less than thirty-five seconds later. Second, the stop video in this case begins with full audio. According to the testimony of Mr. Luegering, the pre-record function never has audio. This supports the finding of a credible pre-recording error not attributable to Trooper Petruso. The Trooper's initial testimony is further corroborated by the fact that the system did label the video "power failure" to the end user without further explanation. His belief that the error was caused by a power failure appears to be reasonable given his apparent lack of advanced technical understanding. The Trooper's testimony, along with the corroborating testimony of Mr. Luegering and other objective evidence supports a finding that Trooper Petruso had reasonable suspicion to stop the Defendants for a traffic violation.[5]

Next, both Defendants argue the Trooper lacked probable cause to search the vehicle. They focus on the dog sniff and subsequent alert or lack thereof. "Probable cause exists when there is a 'fair probability' that contraband is in the car to be searched. Probable cause is a 'commonsense, nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Echeverria*, 203 F. Appx. 936, 938–39 (10th Cir. 2006) (internal citations omitted). A dog sniff around the exterior of a

---

[5] Defendants argue this Court should take a policy stance against such "sloppy police work" and recording. While the Court certainly acknowledges that this situation could have been handled better by Trooper Petruso, this is not a court of public policy. Rather, the Court must find and apply the relevant law. The question here is not whether the video error was addressed perfectly, but whether Trooper Petruso had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction. *Tang*, 332 F. Appx. at 449. With the testimony and objective evidence corroborating his story regarding the video and thus bolstering his credibility, the Court finds no other reason to question the Trooper's recounting of the stop and violation he witnessed.

vehicle during a lawful traffic stop is not a Fourth Amendment search. *See Stewart*, 473 F.3d at 1270. Further "[i]t is well established that [a] canine alert [provides] probable cause to search a vehicle." *Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015) (internal quotations omitted). "The Tenth Circuit has held that a dog alert 'usually is at least reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband.'" *United States v. Chavez*, No. 17-40106, 2018 WL 4053382, at *6 (D. Kan. Aug. 24, 2018). However, a dog alert may not always provide probable cause, particularly where the accuracy of the particular dog may be questioned. *United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993). To determine if the probable cause standard is satisfied, the court must consider "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Fla. v. Harris*, 568 U.S. 237, 248 (2013).

Defendants argue K9 Becky failed to alert and thus probable cause has not been established. The Tenth Circuit has explained that a final indication is not required to establish probable cause.[6] *See United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) ("[A] dog's alert to the presence of contraband is sufficient to provide probable cause. We decline to adopt the stricter rule urged by Mr. Parada, which would require the dog to give a final indication before probable cause is established."); *Chavez*, 2018 WL

---

[6] The Court recognizes there are factual distinctions between a "final indication" and an "alert." For the purposes of this motion however, these do not impact the Court's analysis given the finding that K9 Becky displayed at minimum a change in behavior which is bolstered by other evidence to establish probable cause.

4053382, at *7. However, "[a] behavior change *alone* would not constitute probable cause." *United States v. Munoz-Nava*, 524 F.3d 1137, 1145–46 (10th Cir. 2008) (emphasis added). "This does not preclude the court's consideration of the behavior change, however, when determining whether all of the relevant evidence establishes probable cause." *Id.* (considering change in dog's behavior and other factors such as suspicious boots associated with possible drug trafficking, pattern of traffickers using boots with false compartments, and defendant's unusual explanations to establish probable cause); *see also United States v. Guzman,* 75 F.3d 1090, 1096 (6th Cir. 1996) (holding dog's interest in bag, in addition to other factors, established probable cause); *Chavez*, 2018 WL 4053382, at *7 (finding dog's behavior change along with vehicles recent purchase and registration, multiple cell phones, inconsistent travel plans, and criminal history of drug trafficking established probable cause). Finally, "[t]he absence of a full alert does not negate probable cause when other circumstances support such a finding." *United States v. Ramirez,* 342 F.3d 1210, 1213 (10th Cir. 2003).

Defendants ignore all but the dog sniff in arguing a lack of probable cause. Here, the totality of the relevant evidence establishes probable cause. First, the K9 at minimum indicated a change in behavior according to Trooper Petruso, an expert in Becky's behavior. The Court finds his testimony about the dog and her behavior credible. *See United States v. Beltran-Palafox*, 731 F. Supp. 2d 1126, 1160 (D. Kan. 2010). Together with this change in behavior, Trooper Petruso also credibly testified he smelled marijuana in the vehicle. This in itself supports a finding of sufficient probable cause. *See United States v. Pittman*, 2019 WL 3213532 at *2 (10th Cir. Jul. 17, 2019); *United States v.*

8

*Zabalza*, 346 F.3d 1255, 1259 (10th Cir. 2003) ("An officer's detection of the smell of drugs in a vehicle is entitled to substantial weight in the probable cause analysis. This court has long recognized that marijuana has a distinct smell and that the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage."); *United States v. Stancle*, 184 F. Supp. 3d 1249, 1256 (N.D. Okla. 2016) ("[T]he Tenth Circuit has repeatedly held that an officer's detection of the smell of marijuana 'alone establishes probable cause to search a vehicle for the illegal substance.'") This testimony is corroborated by the Trooper's contemporaneous statements on the dash cam video to Defendant Reyna regarding the odor of marijuana. (ECF No. 51-2).

A third circumstance the Court considers is Defendants' use of air fresheners in a rental car. *See United States v. Brown*, 313 F. Supp. 2d 1108, 1117 (D. Kan. 2004), *aff'd*, 234 F. Appx. 838 (10th Cir. 2007) (recognizing air fresheners used to mask drug odor, factor in analysis); *United States v. Ivey*, 313 F. Supp. 2d 1242, 1250 (D. Utah 2004) (same). This is compounded by Defendant Reyna's opening of a new air freshener while speaking with Trooper Petruso. (ECF No. 51-1). Another factor before the Court is Defendants' use of a rental car. While not inherently suspect, the fact that the vehicle was picked up outside their reported hometown and was overdue is a consideration in the probable cause analysis. *United States v. Williams*, 271 F.3d 1262, 1270 (10th Cir. 2001) ("[A]nswers to questions suggesting an individual is concealing the fact that he had rented a car in a known drug source area can 'give rise to suspicion.'"); *United States v. McRae*, 81 F.3d 1528, 1535 (10th Cir. 1996) (cavalier attitude regarding returning overdue rental car factor in reasonable suspicion analysis); *see also United States v. Brown*, 313 F. Supp.

2d 1108, 1117 (D. Kan. 2004), *aff'd,* 234 F. Appx. 838 (10th Cir. 2007) (overdue rental car). Further, Defendants travel plans were vague and unclear including their starting location and the inability to provide names for alleged family members. The Court also notes according to the Trooper's report, Defendant Reyna did not even know Defendant Aldaco's last name despite reporting they have dated for a year. *See United States v. Ozbirn,* 189 F.3d 1194, 1200 n.4 (10th Cir. 1999) ("[V]ague descriptions of travel plans may still serve to bolster the finding of probable cause when considered as part of the totality of the circumstances.") Taken together, the odor of marijuana[7], K9 Becky's change in behavior, the use of air fresheners in an overdue rental car and the suspect and vague travel plans establish probable cause for a search.

## CONCLUSION

In light of the above analysis, the Court finds the Defendants' Motions to Suppress must be denied. Therefore, IT IS HEREBY:

ORDERED that Defendant Aldaco's *Motion to Suppress Illegally Obtained Evidence* (ECF No. 51) and Defendant Reyna's *Motion to Suppress* (ECF No. 52) are DENIED.

Dated this _30th_ day of July, 2019.

Scott W. Skavdahl
United States District Judge

---

[7] This factor alone likely justifies the search under existing Tenth Circuit precedent.

1

Attachment B

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Defendant's Reply Motion to Challenge K9 and Suppress

KUTAK ROCK LLP
Attorneys at Law
Cutter Tower
510 West Riverside Avenue
Suite 800
Spokane, Washington  99201-0506
(509) 747-4040

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>REYMUNDO YANEZ PACHECO,<br><br>    Defendant. | No. 4:19-cr-00063-RGE-CFB-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |

## I.    INTRODUCTION

Defendant Reymundo Yanez Pacheco was pulled over for traffic violations. Based on the state of Yanez Pacheco's rental car and his behavior during the traffic stop, the investigating officer suspected he was engaged in other criminal activity. In response, the officer deployed his certified canine to sniff Yanez Pacheco's car and then obtained Yanez Pacheco's verbal consent to search the car's back seat. The rental car's spare tire was unsecured on the back seat, along with a backpack. The officer then searched the trunk and found over 40 pounds of methamphetamine in the spare tire compartment. Yanez Pacheco now moves to suppress the methamphetamine and other evidence obtained during the investigatory stop. He argues the officer unlawfully prolonged the traffic stop and lacked probable cause to search the car. For the reasons set forth below, the Court denies Yanez Pacheco's motion.

## II.    BACKGROUND

Before the Court is Yanez Pacheco's Motion to Suppress. ECF No. 49. The matter came before the Court for hearing on August 13, 2019. Mot. Suppress Hr'g Mins., ECF No. 63. Assistant Federal Public Defender Melanie S. Keiper appeared on behalf of Yanez Pacheco. *Id.* Special Assistant United States Attorney Margaret A. Steindorf appeared on behalf of the Government. *Id.*

The Court heard the testimony of two Government witnesses: Cass County Sheriff's Deputy Tyler Shiels and canine handling expert Edward J. Van Buren. Mot. Suppress Hr'g Witness List, ECF No. 63-2. The Court also heard the testimony of a Defense witness: canine handling expert Jerry Potter. *Id.* The Court received exhibits from both parties, including videos of the traffic stop. Mot. Suppress Hr'g Ex. List, ECF No. 63-1; Gov't's Exs. 1–11, ECF Nos. 53-1 to 53-9, 62-1, 62-2; Def.'s Exs. A–C, ECF Nos. 66, 66-1; *see also* Ct. Ex. 1, ECF No. 64.

The Court finds the following facts by a preponderance of the evidence for the purpose of considering Yanez Pacheco's motion. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *accord United States v. Long*, 797 F.3d 558, 570 (8th Cir. 2015).

Around 10:32 p.m. on April 9, 2019, Cass County Sheriff's Deputy Tyler Shiels pulled over Yanez Pacheco in Cass County, Iowa, for speeding and improper use of lanes. At the time, Yanez Pacheco was driving eastbound on Interstate 80 in a white Jeep bearing California license plates. Shiels was patrolling Interstate 80 with his canine partner, a dog named Mufasa. Shiels has worked full time in law enforcement since 2012. He has worked as Mufasa's canine handler since 2015. The Heart of America Police Dog Association ("HAPDA") certified Shiels and Mufasa in patrol work and narcotics detection. Gov't's Ex. 2, ECF No. 53-2. The odors Mufasa is certified to detect include methamphetamine. *Id.*

Shiels approached Yanez Pacheco's car and spoke with him through the open passenger window. He explained to Yanez Pacheco that he had pulled him over for speeding and erratic driving. He requested Yanez Pacheco's driver's license and registration. Yanez Pacheco produced his California driver's license and a rental agreement for the car. While standing at the passenger window, Shiels noticed a rosary hanging from the car's rearview mirror. Based on his training and experience, this display of a personal item was unusual in a rental car. ECF No. 53-1 at 3 (incident report). He further noted the car had a "lived-in look"—a case of soda and several food items were

2

on the front floorboard, suggesting Yanez Pacheco was making limited stops and eating his meals in the car. *Id.* Shiels also did not observe any luggage in the car, which he considered unusual for a multi-day trip from California to Iowa. *Id.* After a brief conversation, Shiels told Yanez Pacheco he would issue him written warnings for the traffic violations. He asked Yanez Pacheco to sit in the passenger seat of his squad car while he wrote the warnings. Yanez Pacheco complied.

In the squad car, Shiels reiterated he was writing Yanez Pacheco a warning for speeding and driving "all over the road." He explained that Yanez Pacheco had been driving 74 miles per hour in a 70-mile-per-hour zone. He emphasized that Yanez Pacheco's fluctuations in speed had also caught his attention. Shiels then asked Yanez Pacheco where he was traveling. Yanez Pacheco replied, "Iowa," as if he did not know they were currently in Iowa. Shiels asked where in Iowa, and Yanez Pacheco said, "Marsh . . ." a few times, as if struggling to recall his destination. Shiels suggested "Marshalltown" and Yanez Pacheco confirmed that was where he was headed. Shiels asked why Yanez Pacheco was going to Marshalltown, and for how long. Yanez Pacheco said he was visiting friends for four or five days. Shiels noted in his incident report that the rental period on the rental agreement was not long enough for Yanez Pacheco to drive from California to Marshalltown, stay for four or five days, and then drive back to California. ECF No. 53-1 at 3. At the motion to suppress hearing, Shiels testified the rental agreement was one-way. Additionally, Yanez Pacheco told Shiels later in the night that he would be flying back to California. Def.'s Ex. A at 2:00:37–2:00:47, ECF No. 66. Shiels testified that, based on his training and experience, a one-way rental with a return flight was suspicious because it is very expensive to rent a car in one location, drop it off in another, and return by air. The rental agreement was not admitted into evidence.

Throughout their conversation in the squad car, Shiels perceived Yanez Pacheco as nervous, and at times felt he was trying to avoid discussing his trip details. For example,

immediately after they discussed where Yanez Pacheco was going, Yanez Pacheco remarked how the weather in Iowa was much different than the weather in California. Soon after, Yanez Pacheco asked if Shiels ever took breaks from work, and whether he had to respond to calls during breaks. Based on his training and experience, Shiels knew persons engaged in criminal activity commonly try to control conversations with officers to avoid unwanted questioning. More generally, Shiels noticed Yanez Pacheco was acting very nervous. For much the conversation, Yanez Pacheco was sitting on the side of the passenger seat, looking around at the equipment in the squad car, and avoiding eye contact. Shiels perceived these nervous behaviors as inconsistent with the context of the situation—Shiels had told Yanez Pacheco he would receive only warnings for the traffic violations.

After preparing the warnings, Shiels asked Yanez Pacheco to sign them and gave him copies to keep. He then told Yanez Pacheco he was going to run his dog around the rental car. Yanez Pacheco's response is not clear in videos of the stop, but he appears to ask if he should wait in the squad car. Shiels confirms by asking him to wait in the squad car. At the hearing, Shiels testified only that he explained to Yanez Pacheco that he was going to deploy Mufasa. He did not testify that he requested or obtained Yanez Pacheco's consent to conduct the sniff.

Shiels then walked Mufasa around Yanez Pacheco's rental car several times. On the first pass, Mufasa jumped up to the open passenger window, putting his left paw on the door and his head through the open window for a few seconds. On the second pass, Mufasa did not jump up to the passenger window at first. Shiels led him back toward the rear of the car and turned around to again walk him past the open window. This time, Mufasa jumped up and put his head through the window for several seconds, resting both paws on the door. Shiels testified that, as Mufasa's trained handler, he perceived that Mufasa was "receiving narcotic odor" and "attempting to identify" where the narcotics were in the car. On Mufasa's third pass around the car, Mufasa

4

quickly snapped his head toward the trunk, which Shiels perceived as an alert to narcotics. Back on the passenger side, Mufasa again walked past the open window without jumping. Shiels again led him back to the rear of the car and doubled back toward the passenger window. Again, Mufasa jumped up and put his head through the window for several seconds. Shiels testified Mufasa was "very excited" at this point and looked as if he wanted to get inside the car. When Mufasa came down, Shiels reached for his flashlight, ripping the Velcro strap on the case. Shiels then said, "good boy." He guided Mufasa to the passenger window one more time, but Mufasa did not jump up. From experience, Shiels knows Mufasa expects a treat when he hears Velcro. Because Mufasa was expecting a treat, Shiels relieved him of further duties and put him back in his squad car. In total, Mufasa's deployment took less than two and a half minutes. *See* Def.'s Ex. B at 20:54–23:17, ECF No. 66.

At the hearing, the parties presented conflicting evidence as to whether Mufasa's behaviors constituted an "alert"[1] to narcotics. Shiels testified Mufasa alerted on the first pass around the car when he jumped up to the passenger window. He further testified Mufasa's head snap toward the trunk was an alert. Shiels went on to testify that, based on these alerts, he continued to lead Mufasa around the car and toward the passenger window to see if he would "indicate."[2] The parties agree that Mufasa never indicated on the car. Shiels testified that, in his opinion, Mufasa never indicated because he was overwhelmed by the strong odor of over 40 pounds of methamphetamine in the car.

The Government's canine handling expert, Edward J. Van Buren, corroborated Shiels's

---

[1] The parties and their experts disagree on the precise meaning of "alert," but they generally agree it refers to the behavior a narcotics-detection dog exhibits upon detecting the odor of narcotics.
[2] The parties and their experts generally agree that a narcotics-detection dog "indicates" when it exhibits specific, trained behavior to identify the source location of the narcotics odor emanating from a car.

testimony that Mufasa alerted on the car. He further testified that HAPDA, the organization that certified Mufasa and Shiels, is a bona fide organization. He offered this opinion as a judge that certifies narcotics-detection dogs for HAPDA, and as one of the three judges that certified Shiels and Mufasa as a patrol and narcotics-detection team. He also testified to the details of HAPDA's certification process.

Yanez Pacheco's canine handling expert, Jerry Potter, disagreed. He testified Mufasa never alerted on the car. He testified Mufasa exhibited none of the behaviors he would expect to see in a dog that has detected the odor of narcotics, such as "bracketing"[3] or closed-mouth breathing. More generally, he testified Mufasa showed no signs of interest or excitement in the car. He also testified Shiels improperly "cued" Mufasa to focus on the passenger window. Finally, he testified to what he considered certain deficiencies in HAPDA's bylaws and certification program.

Ultimately, for reasons discussed below, the Court need not resolve the factual disputes about the significance of Mufasa's behavior toward Yanez Pacheco's rental car.

After Shiels returned Mufasa to the squad car, he asked Yanez Pacheco if there was anything illegal in the rental car. Yanez Pacheco said no. Shiels then asked Yanez Pacheco if he could look in the back seat. Yanez Pacheco said yes. Def.'s Ex. B at 23:10–23:14, ECF No. 66. Shiels asked again to confirm, and Yanez Pacheco again said yes. *Id.* at 23:14–23:18. Shiels then returned to the rental car and opened the passenger door. At that point, Shiels noticed Yanez Pacheco had exited the squad car and was approaching the rental car. Shiels expressed confusion as to why Yanez Pacheco had left the squad car, but then told him he could wait in the rental car. Yanez Pacheco sat in the driver's seat of the rental car. Shiels again confirmed that Yanez Pacheco

---

[3] Potter testified that a narcotics-detection dog exhibits "bracketing" behavior when it moves its head back and forth to try to close in on the source of an odor. Van Buren was not familiar with the term.

did not object to him looking in the back seat. Shiels testified Yanez Pacheco's response was "something to the extent of yes." The response from Yanez Pacheco is inaudible on videos of the encounter. Def.'s Ex. B at 23:50–23:59, ECF No. 66.

Shiels then opened the back passenger-side door. He noticed the spare tire in the back seat and asked why it was there. Yanez Pacheco said the rental company had changed one of the tires. The unusual location of the spare tire made Shiels suspicious. Based on his training and experience, Shiels knew drug traffickers often hide drugs in the spare tire compartment. ECF No. 53-1 at 3. Shiels also saw a backpack in the back seat. He asked where Yanez Pacheco's luggage was, and Yanez Pacheco told him it was in the backpack. Shiels remarked on the small amount of clothing he packed, and Yanez Pacheco said he was planning to buy more during his visit to Marshalltown. Shiels testified he found the minimal amount of clothing "very bizarre" given the stated length of the trip.

At that point, Shiels asked Yanez Pacheco to return to his squad car, which he did. Shiels then searched the trunk of the rental car and discovered thirty-six bundles of methamphetamine weighing approximately 18.75 kilograms (41.3 pounds) in the car's spare tire compartment. After placing Yanez Pacheco under arrest and advising him of his *Miranda* rights, Shiels moved him to the back seat of his squad car, where he continued to ask him questions. Shiels testified that Yanez Pacheco later consented to a search of his cell phone.

A federal grand jury indicted Yanez Pacheco on two counts: 1) conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846; and 2) possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A). Redacted Indictment, ECF No. 27.

Additional factual findings are set forth below as needed.

7

III.    **LEGAL STANDARDS**

Yanez Pacheco moves to suppress the methamphetamine discovered in the trunk of his rental car, the statements he made throughout the stop, and the contents of his cell phone. ECF No. 49. He argues Shiels's search of his rental car violated the Fourth Amendment, and that all of this evidence resulted from the violation. *Id.*; Def.'s Br. Supp. Def.'s Mot. Suppress, ECF No. 49-1.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "[S]ubject only to a few specifically established and well delineated exceptions," warrantless searches and seizures "are *per se* unreasonable under the Fourth Amendment." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Among these exceptions are 1) temporary seizures of persons during traffic stops based on reasonable suspicion or probable cause; 2) searches and seizures of automobiles based on probable cause; and 3) searches based on consent.

A traffic stop is a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "[A] traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." *United States v. Chartier*, 772 F.3d 539, 543 (8th Cir. 2014) (quoting *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006)). "Reasonable suspicion exists when an 'officer is aware of "particularized, objective facts, which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.""" *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014)

(quoting *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012)).

"A constitutionally permissible traffic stop can become unlawful, however, 'if it is prolonged beyond the time reasonably required to complete' its purpose." *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). To determine whether a dog sniff of a car during a traffic stop impermissibly extends the stop, "[t]he critical question . . . is . . . whether conducting the sniff prolongs—*i.e.*, adds time to—the stop." *Id.* at 1616 (internal citations and quotation marks omitted). When an officer addresses a driver's traffic infraction and conducts a dog sniff at the same time, the traffic stop is not unlawfully prolonged. *United States v. Harry*, 930 F.3d 1000, 1005 (8th Cir. 2019). But once the tasks associated with a traffic stop have concluded, officers may not further prolong the stop absent reasonable suspicion of additional criminal activity. *Rodriguez*, 135 S. Ct. at 1615.

Under the automobile exception, a warrantless search of an automobile is permitted when there is probable cause to believe the automobile contains evidence of criminal activity. *Carroll v. United States*, 267 U.S. 132, 158–59 (1925); *accord United States v. Davis*, 569 F.3d 813, 817–18 (8th Cir. 2009). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (quoting *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003)).

Finally, the consent exception permits warrantless searches based on voluntary consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222–23 (1973). "Voluntariness is a question of fact to be determined from all the circumstances." *Id.* at 248–49. "The government bears the burden of

proving, by a preponderance of the evidence, that [an individual's] consent to the search was given freely and without coercion." *United States v. Becker*, 333 F.3d 858, 861 (8th Cir. 2003).

## IV.    DISCUSSION

Yanez Pacheco does not contend Shiels lacked probable cause to pull him over for traffic violations. Instead, he argues Shiels violated his Fourth Amendment rights by prolonging the traffic stop to deploy Mufasa. ECF No. 49-1 at 3–4. He further contends Mufasa's reaction to the car did not establish probable cause for Shiels to search the car for narcotics, such that Shiels's search of the car also violated the Fourth Amendment. *Id.* at 4–8.

The Court concludes Shiels did not violate Yanez Pacheco's Fourth Amendment rights. First, Shiels had reasonable suspicion that Yanez Pacheco was engaged in criminal activity, which justified his brief deployment of Mufasa. Second, Yanez Pacheco voluntarily consented to Shiels's search of the back seat of the rental car. Third, Shiels had probable cause to search the trunk based on his earlier observations and his consent search of the back seat, making the trunk search lawful under the automobile exception to the warrant requirement. For these reasons, the Court denies Yanez Pacheco's motion to suppress. Because the Court determines Shiels had probable cause to search the car without regard to Mufasa's reactions to the rental car, the Court need not address whether Mufasa provided independent probable cause to search the car.

### A.    Reasonable Suspicion to Extend the Traffic Stop

Yanez Pacheco argues Shiels unlawfully extended the traffic stop by continuing to detain him after issuing the traffic warnings. ECF No. 49-1 at 3–4. The Government responds that Shiels's deployment of Mufasa did not "measurably extend" the stop, and even if it did, the extension was justified by Shiels's reasonable suspicion of criminal activity. Gov't Resist. Def.'s Mot. Suppress at 12–13, ECF No. 53 (quoting *Rodriguez*, 135 S. Ct. at 1615). The Court concludes Shiels had reasonable suspicion to extend the stop, so the Court need not address whether Shiels's

deployment of Mufasa "measurably extend[ed]" the stop. *See id.*

Reasonable suspicion requires "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). A "hunch" does not suffice, but the standard requires less suspicion than probable cause and "considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* at 397 (internal citation and quotation marks omitted); *see also United States v. Tamayo-Baez*, 820 F.3d 308, 312 (8th Cir. 2016) ("[T]he Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop" (quoting *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004))). The ultimate determination is based on the totality of the circumstances. *Navarette*, 572 U.S. at 397.

Here, the totality of the circumstances provided reasonable suspicion that Yanez Pacheco was engaged in criminal activity. During the initial traffic stop, Shiels asked Yanez Pacheco several routine questions about his trip. Yanez Pacheco's answers were confusing and at times improbable. Yanez Pacheco told Shiels he was traveling to "Iowa," although they were already in Iowa. He could not recall the name of his destination (Marshalltown). And he told Shiels he was visiting friends for four or five days, which was inconsistent with the lack of luggage and short car-rental period on the rental agreement. The rental agreement is not in evidence, but the Court credits Shiels's testimony that the rental period was not appropriate to the length of the travel. Whether Yanez Pacheco was driving or flying back to California, the discrepancy between the rental period and Yanez Pacheco's stated trip length justified Shiels's suspicions. If Yanez Pacheco was driving back, his stated trip details were implausible given the short rental period. If he flying back, his travel arrangement was, in Shiels's experience, unusually expensive.

Shiels's other observations bolstered these suspicions. Yanez Pacheco was driving a rental car from California to Iowa. The case of soda and food on the front floorboard suggested

11

he was making limited stops. The rosary hanging from the rearview mirror contributed to the car's "lived-in look." Yanez Pacheco was also abnormally nervous considering the circumstances. While in Shiels's patrol car, he sat on the side of the passenger seat, looked around the car at the equipment, and avoided eye contact. On multiple occasions, he attempted to direct the conversation away from his trip details. Considering Shiels's training and experience, the Court credits Shiels's testimony on the observations he made and the conclusions he drew.

The Eighth Circuit has found reasonable suspicion under similar circumstances. *See, e.g., Murillo-Salgado*, 854 F.3d at 411–16 (holding officer had reasonable suspicion to detain two men driving a rental car from California to North Carolina because the amount of supplies and the car's rental period "appeared insufficient to accomplish the stated purposes of the trip" and the men provided inconsistent responses to questions about the trip); *United States v. Lebrun*, 261 F.3d 731, 733–34 (8th Cir. 2001) (holding officer had reasonable suspicion to detain occupants of rental car because he received "vague and confused" answers to "routine questions," noticed they were "unusually nervous," and observed drink containers, food wrappers, and other evidence of limited stopping). Thus, Shiels's brief extension of the traffic stop to allow Mufasa to circle the car was justified by his reasonable suspicion that Yanez Pacheco was engaged in criminal activity.

### B.    Consent to Search the Back Seat

Immediately after deploying Mufasa, Shiels asked for Yanez Pacheco's consent to search the back seat. The Government argues Yanez Pacheco validly consented to this search. ECF No. 53 at 7–9. Yanez Pacheco does not directly address this argument, but at the hearing his counsel called into question whether Yanez Pacheco fully understood all of Shiels's questioning.

Voluntary and knowing consent provides a valid basis for a warrantless search. *See United States v. Correa*, 641 F.3d 961, 966 (8th Cir. 2011). "The question of voluntariness requires a broad factual inquiry; there is no bright-line rule to determine when an 'essentially free and unconstrained choice,' becomes one that is 'the result of duress or coercion.'" *United States v. LeBeau*, 867 F.3d 960, 971 (8th Cir. 2017) (quoting *United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006)). The Court must determine, based on the totality of the circumstances, "not whether [a defendant] subjectively consented, but rather, whether a reasonable officer would believe consent was given." *Correa*, 641 F.3d at 967 (alteration in original) (quoting *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009)). To determine the reasonableness of the officer's belief, "we consider the nature of the encounter and the characteristics of the consenting party, including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects." *United States v. Almendares*, 397 F.3d 653, 660–61 (8th Cir. 2005); *accord LeBeau*, 867 F.3d at 971.

Here, the Government has shown by a preponderance of the evidence that Yanez Pacheco voluntarily consented to Shiels searching the back seat of the rental car. Videos of the stop clearly capture the initial exchange over consent. Shiels asks twice if he can search the back seat and Yanez Pacheco unambiguously says yes both times. Def.'s Ex. B at 23:11-23:18, ECF No. 66. After Yanez Pacheco exits the squad car and follows Shiels back to the rental car, Shiels again confirms that Yanez Pacheco does not object to him searching the back seat. Shiels testified at the hearing that Yanez Pacheco said, "something to the extent of yes," and Yanez Pacheco presented no evidence to the contrary. Yanez Pacheco's responses are inaudible on the video, *id.* at 23:50–23:59, but his actions are consistent with consent. He continues to answer Shiels's

13

questions about his luggage and the spare tire and does not appear to object or otherwise attempt to prevent the search. The Court credits Shiels's testimony that Yanez Pacheco continued to express consent to the search of the back seat.

The Court also finds no barrier to consent in "the nature of the encounter and the characteristics of the consenting party." *Almendares*, 397 F.3d at 660. At the hearing, Yanez Pacheco's counsel suggested during argument that Yanez Pacheco, a non-native English speaker, had trouble understanding some of Shiels's questions. Yanez Pacheco's counsel further emphasized that Shiels called for a Spanish interpreter later in the night—after Yanez Pacheco requested one. *See* Def.'s Ex. A at 1:17:24–1:17:34, 1:54:34–1:54:45, ECF No. 66. The Court does not find that any language barrier between Shiels and Yanez Pacheco prevented Yanez Pacheco from voluntarily consenting. *See Pena-Ponce*, 588 F.3d at 584 (holding officer reasonably believed he had voluntary consent where driver "spoke only broken English and had difficulty understanding some questions," but "conversed without difficulty for a substantial portion of the conversation[,] . . . provided his license and registration on request[,] . . . responded appropriately to questions[,]" and made clear when he did not understand a question). The video evidence shows that Shiels and Yanez Pacheco conversed in English on various topics over the course of the stop. Shiels sometimes had to repeat or clarify his questions, but he did so only when Yanez Pacheco did not initially answer or otherwise signaled he did not understand the question. There are no instances in the videos of Yanez Pacheco misunderstanding questions and then providing incongruous answers. *Cf. United States v. Guerrero*, 374 F.3d 584, 588 (8th Cir. 2004) (holding the defendant did not provide voluntary consent to search where officer asked suspect how fast he was going and suspect replied, "Chicago"). In his police report, Shiels described Yanez Pacheco's English as "rather fluent." ECF No. 53-1 at 3. He also testified at the hearing that Yanez Pacheco spoke English well compared to other individuals he commonly encountered. The Court credits

14

Shiels's testimony and concludes Yanez Pacheco voluntarily consented to the search of his back seat.

### C.    Probable Cause to Search the Trunk

Finally, the Court considers whether Shiels had probable cause to search the rental car's trunk. Yanez Pacheco argues Mufasa did not provide probable cause to search the car, and there was no other basis for doing so. ECF No. 49-1 at 3–8. The Government argues Shiels had probable cause to search the car without regard to any alert by Mufasa. ECF No. 53 at 7–12. Alternatively, the Government argues Mufasa alerted, and this alert gave Shiels probable cause to search the whole car including the trunk. *Id.* at 13–17. The Court concludes Shiels had probable cause to search the car—and the spare tire compartment in particular—based on the totality of his initial suspicions and the additional suspicions developed while searching the back seat. Therefore, the Court need not address whether Mufasa's behavior provided probable cause to search the trunk.

"For constitutional purposes, [there is] no difference between on the one hand seizing and holding a car before presenting a probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." *Chambers v. Maroney*, 399 U.S. 42, 52 (1970); *see also Murillo-Salgado*, 854 F.3d at 417 ("A warrantless search of an automobile for contraband is allowed under the Fourth Amendment if an officer has probable cause to justify the search.") "[W]hen the automobile exception applies, the vehicle need not be immediately searched." *United States v. Castaneda*, 438 F.3d 891, 894 (8th Cir. 2006). "[W]arrantless searches of vehicles by state officers have been sustained in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent." *Cady v. Dombrowski*, 413 U.S. 433, 441–42 (1973).

"Probable cause is a fluid concept that focuses on 'the factual and practical considerations

15

of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). "Observations made by an officer during a consensual search of a vehicle may provide the officer with probable cause to expand the scope of the search under the automobile exception." *Murillo-Salgado*, 854 F.3d at 417. "[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 418 (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)).

Based on the totality of circumstances, Shiels had probable cause to search the trunk of the rental car. As explained above, Shiels already had reasonable suspicion that Yanez Pacheco was engaged in criminal activity before he obtained Yanez Pacheco's consent to search the back seat. Shiels's search of the back seat enhanced those suspicions and gave him probable cause to search the rest of the car. Upon opening the back door, Shiels noticed the car's spare tire and a backpack. He asked Yanez Pacheco where his luggage and clothing were. Yanez Pacheco told him his clothing was in the backpack and added that he was planning to buy more in Marshalltown. Shiels also asked about the spare tire, and Yanez Pacheco told him the rental company had changed it. These improbable responses, coupled with Shiels's experience that drugs are often hidden in spare tire compartments, created probable cause for Shiels to search the trunk of the rental car. *See, e.g., United States v. Martel-Martines*, 988 F.2d 855, 858–59 (8th Cir. 1993) (holding driver's "evasive and inconsistent responses to routine questions" coupled with an "inaccessible hidden compartment" discovered during consent search gave officers probable cause to search hidden compartment), *subsequent mandamus proceeding sub nom. Martel-Martinez v. Reno*, 61 F.3d 916 (10th Cir. 1995); *cf. United States v. Alverez*, 235 F.3d 1086, 1089 (8th Cir. 2000) (holding officers' discovery of functional spare tire in trunk after learning occupants of car had

purchased tire sealant to fix another damaged tire gave them probable cause to examine the spare tire, where they found methamphetamine). Thus, Shiels's warrantless search of the trunk was permissible under the automobile exception.

## V. CONCLUSION

For the foregoing reasons, admitting at trial the evidence obtained through the stop of Yanez Pacheco's rental car does not violate the Fourth Amendment. Shiels had reasonable suspicion to deploy his dog to sniff Yanez Pacheco's rental car, making the short extension of the traffic stop lawful. Yanez Pacheco provided consent for Shiels to search the back seat. And Shiels's observations of Yanez Pacheco and the rental car gave Shiels probable cause to search the trunk.

**IT IS ORDERED** that Defendant Reymundo Yanez Pacheco's Motion to Suppress Evidence, ECF No. 49, is **DENIED**.

**IT IS SO ORDERED.**

Dated this 11th day of September, 2019.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE

17