FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 10, 2021

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

              Plaintiff,

    v.

MICHAEL LEE VANTIGER,

              Defendant.

No. 4:20-CR-06010-SAB-1

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS**

      The Court held a motion hearing in the above-captioned matter on March 8, 2021. The Government was represented by Assistant United States Attorney Stephanie Van Marter, who appeared by video conference. Defendant was represented by Geana Van Dessel, who appeared by video conference. Defendant, with his consent, appeared by video conference from the Benton County Jail.

      During the hearing, the Court considered Defendant's Motion to Suppress, ECF No. 76. Although originally scheduled as an evidentiary hearing, the parties agreed to cabin the hearing to the issues of whether there was probable cause to stop the vehicle Defendant was traveling in and whether law enforcement's use of a ruse was unreasonable under the Fourth Amendment. After hearing oral argument, the Court took the motion under advisement. Having heard from the parties and reviewed the briefing and applicable case law, the Court denies Defendant's motion in part and reserves ruling on the issues of the reliability of the K9 drug dog alert, the sufficiency of the search warrant, and the ultimate question of suppression on those bases.

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS \* 1**

**Facts**

The following facts are drawn from Defendant's motion, the declaration and materials submitted in support of the motion, the Government's sealed response, and the declaration and materials submitted in support of the response.

1. Investigation into Defendant

   a. *Arrest and Interviews of Cooperating Defendants 2 and 1*

Special Agent Deitering, along with other members of the DEA Tri-Cities Post of Duty and the Tri-Cities Metro Drug Task Force, have been investigating fentanyl and other drug distributors in the Tri-Cities area since 2018. During the course of those investigations, Defendant was identified by at least two cooperating defendants as one of the area's local distributors.

On October 29, 2018, DEA Agents and Task Force Officers ("TFO") conducted a reversal drug buy operation in Yakima, Washington. This resulted in the arrest of Cooperating Defendant 2 ("CD-2"). At the time of their arrest, CD-2 was in possession of $225,000 in cash and 7,187 blue pills later confirmed to contain fentanyl. After CD-2's arrest, TFO Chris Slocombe and TFO Thomas Orth conducted a post-*Miranda* interview with CD-2 at the DEA office in Yakima. CD-2 told TFOs Slocombe and Orth and SA Deitering that they were in Yakima to retrieve 9 kilograms of cocaine in exchange for the cash they were carrying. CD-2 said that $75,000 of the cash they had belonged to Defendant and that CD-2 was given the cash by Defendant while at his house the day before being arrested. He described CD-2's residence, off Clearwater Avenue and by a USA Brakes store, in Kennewick, Washington. CD-2 also advised that Defendant drove a black GMC Denali and that they were supposed to call Defendant as soon as they got back from Yakima to arrange a drop-off of the cocaine at Defendant's home. CD-2 said that Defendant was to pay CD-2 $3,000 per kilogram for delivery of Defendant's share of the cocaine. CD-2 positively identified Defendant from a photo lineup featuring Defendant's driver's license photo.

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS * 2**

Around this time, SA Deitering queried Defendant through the ILEADS database, which identified Defendant's last known address as a particular residence on N. Perry Street in Kennewick, Washington. According to the Benton County Assessors, the residence has been owned by Defendant's grandmother since July 2014. The agents began surveilling the home throughout the investigation and confirmed it was Defendant's residence.

On November 7, 2018, TFO Ward and TFO Orth met with another subject arrested based on their involvement in fentanyl distribution (CD-1). CD-1 had been arrested after a confidential source conducted several controlled buys of fentanyl from CD-1. Surveillance of CD-1 during the controlled buy showed that CD-1 had traveled to Defendant's residence on Perry Street. CD-1 was advised of their *Miranda* rights; CD-1 said they understood their rights and wished to speak with the officers. CD-1 told the officers that they had been selling counterfeit oxycodone tablets (also called fentanyl pills or mexi's) for the past nine months to support their own addiction. CD-1 advised they normally sold around 100 tablets at a time and had a small clientele. They further advised that the source of their pills was Defendant and that they had known Defendant for around eight years. CD-1 stated that defendant lived with his grandmother in Kennewick, close to a Walkers Furniture store. SA Deitering confirmed that there is a Walkers Furniture store near Defendant's residence. CD-1 stated that Defendant would commonly meet them in the Walkers parking lot, where Defendant would supply them with the counterfeit oxycodone tablets. CD-1 said that Defendant normally met them in the lot in a black GMC SUV and that the vehicle had a trap or secret compartment behind the radio. They advised that they saw law enforcement execute a search warrant at Defendant's residence and missed a large amount of oxycodone tablets in the void in the GMC (the void is a manufacturer's natural void behind the radio faceplate, not a trap that Defendant himself created or added). TFO Orth asked CD-1 if they knew of any additional controlled substances Defendant distributed. CD-1 said that

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS * 3**

Defendant told them that he also sold large quantities of cocaine and that one of his suppliers had recently been arrested in Yakima (this was CD-2). CD-1 also said that Defendant sold fentanyl pills in quantities of 1,000 at a time.

From November 2018 through January 2019, the investigation into Defendant continued, but no significant information was learned by the investigating agents.

### b. Investigation into Defendant's Gambling Records and Employment

The Government also looked into Defendant's gambling records and employment history during the course of its investigation. On January 16, 2019, Investigative Analyst Shawn Rullie requested the player's card gambling records for Defendant from the Washington State Gambling Commission. Records were sought for Defendant for the time period spanning January 15, 2017 through April 21, 2019. The records showed that Defendant had gambled a cumulative $100,385 in that time period and lost a total of $56,675. Previous records obtained were combined with that request, showing Defendant had $860,362 in gambled funds and $424,793 in lost funds. An updated request was sent on January 16 for the time frame between January 1, 2017 and the time of the request. The request was returned via email and included copies of the player's card records for Defendant at the Washington Gold Casinos, Caribbean Yakima casinos, and Joker's Casino, covering a total of 18 casinos. The records also included two external compensation records on May 30 and October 18, 2017, when Defendant exchanged his "player points" for cash or goods external to the casino's network. The combined player's card records indicate that between January 15, 2017 and January 16, 2019, Defendant gambled $759,977 and lost a total of $368,118. Another request showed Defendant had gambled a total of $176,110 and lost a total of $111,925 between January 1, 2019 and January 15, 2020.

Based on his training and experience, SA Deitering believed Defendant may have been a narcotics trafficker, as traffickers commonly launder drug proceeds through casinos in order to convert illegal drug proceeds into legal US currency.

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS * 4**

On January 22, 2020, TFO Ward requested employment records for Defendant from the Washington State Employment Security Department. The records showed that Defendant had not been employed since January 1, 2016 and that there were no recorded wages for Defendant on record. However, on a Facebook page under the screen name "Mikey Vantiger," SA Deitering saw a post on January 28, 2020 that Defendant may have been operating a new business sharpening barber scissors, shears, knives, and other blades. However, on February 5, 2020, SA Deitering visited the location listed on the business card pictured in the post and confirmed that the store did not appear open for business and there were no records indicating Defendant had received any income for the business.

     *c. Investigation into Snapchat Account "rundatback509"/ "Mikey Vantiger"*

TFO Ward has been monitoring a Snapchat account with the username "rundatback509" and screen name "Mikey Vantiger" since October 15, 2019. On October 15, 2019, the owner of the account—believed to be Defendant—accepted a friend request from TFO Ward's undercover Snapchat account. Based on his Snapchat posts, it appeared Defendant was regularly making short trips to Southern California and back to Tri-Cities within the space of a weekend. Defendant also posted pictures of himself in possession of large amounts of cash on a regular basis. The earliest pictures from this surveillance were not available due to Snapchat's retention policy. However, the Government's response includes pictures of multiple posts from early January 2020 that feature large amounts of cash, captions referencing travel to California, and the manufacturer's void in the GMC Denali described by CD-1.

On January 8, 2020, TFO Ward obtained a search warrant for the Snapchat account from Benton County Superior Court Judge Carrie Runge. TFO Ward forwarded a copy of the warrant to Snapchat Law Enforcement Center via email. On January 15, 2020, TFO Ward received all data that was requested in the

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS \* 5**

warrant from Snapchat, including geolocation data for Snapchat messages sent between October 15, 2019 and January 8, 2020. The majority of the posts were sent from the Tri-Cities area, but there were several locations outside of Tri-Cities that the officers believed was consistent with Defendant's reported drug trafficking activities. These included location pins in Hesperia, California; Yakima, Washington; Seattle/King County, Washington; and Porterville, California. TFO Ward and SA Deitering also reviewed text message conversations sent via Snapchat. Several conversations referenced frequent trips to California "for work." Finally, the officers observed thirteen videos and photos posted on Defendant's Snapchat account, including pictures of him fanning himself with a large handful of cash in Yakima and stacks of currency in southern California.

### d.  GPS Phone Pings on Target Telephone 1

On January 17, 2020, IA Rullie submitted an administrative subpoena to Sprint, requesting the subscriber account information and toll records related to phone number 509-308-4413 (TT-1). The subscriber information listed Defendant as the account holder and the address as Defendant's identified residence on Perry Street in Kennewick. The subpoena showed that the number was currently active and had been activated on February 12, 2018.

On January 30, 2020, TFO Ward applied for a federal GPS Phone Ping Order for TT-1, suspected to be utilized by Defendant. Magistrate Judge Dimke granted the order the same day, allowing investigators to track the phone for a period of 45 days from the date of the Order. The "ping" was activated on January 31.

### e.  Facebook Posting on February 6, 2020 and Events on February 8, 2020

On February 6, 2020, TFO Ward and SA Deitering observed a Facebook post from the Mikey Vantiger account. The post was dated that day and stated "Someone wanna make some decent cash must have dl and credit card and can be

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS * 6**

done from sat until Monday let me know ASAP inbox me for details." The officer suspected that Defendant may be planning to leave Tri-Cities for California to pick up drugs between Saturday, February 8, 2020 and Monday, February 10, 2020. The officers also learned that Defendant had been actively using Facebook as a tool to look for individuals with a "dl" (believed to be a driver's license) and a credit card to employ as a driver for this re-supply trip.

On February 8, 2020, at around 7:30 a.m., Defendant was observed by SA Deitering standing on the front porch of his residence. At approximately 7:38 a.m. a white Chrysler sedan arrived and parked in the driveway. Defendant came out of the doorway and loaded a large black suitcase in the truck of the vehicle. He then got in the front passenger seat and the car drove away. Less than a minute later, TFO Ward told SA Deitering via police radio that he observed the driver of the vehicle to be a Hispanic woman with blonde curly hair and identified the car as a white Chrysler 300 with a specific Oregon license plate. TFO Ward and SA Deitering followed the vehicle as it left Tri-Cities and headed south on I-82 towards Oregon. At approximately 8:38 a.m., SA Deitering queried the Oregon license plate number through NCIC, which returned a 2019 Chrysler 300 registered as a rental vehicle owned by Avis/Budget Group.

TFO Ward and SA Deitering continued to monitor the GPS ping data as the pings travelled southbound on I-5 into and through Los Angeles. On February 9, the pings began to travel back north but along a less direct route through highways in Southern and Central California. SA Deitering knew this to be a common tactic used by drug traffickers when traveling with controlled substances in an effort to avoid law enforcement.

2. Investigatory Traffic Stop of Defendant on February 10, 2020

On February 10, 2020, SA Deitering applied for and Magistrate Judge Rodgers granted a search warrant for Defendant's residence. That same day, TFO Ward and SA Deitering briefed members of the DEA Tri-Cities POD, Tri-Cities

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS * 7**

Metro Task Force, Kennewick Police Department, and Paso Police Department K9 Detective Andy Corral of a plan to stop the 2019 Chrysler 300 as it entered the Eastern District of Washington later that day. That afternoon, DEA investigators identified the vehicle as it traveled eastbound along I-84 in Oregon. They observed Defendant in the front passenger seat with a Hispanic woman driving. SA Deitering requested that K9 Detective Corral conduct an investigative stop of the vehicle.

Detective Corral and Segreant Scott Warren conducted an investigative traffic stop of the 2019 Chrysler while it was travelling northbound on I-82 toward Kennewick, at around 3:00 p.m. The stop was documented on Detective Corral's body cam. The driver was Gloria Gomez, and Defendant was riding in the front passenger seat. Detective Corral, using a ruse due to "the sensitive investigative information," told them they were stopped after receiving a report of erratic driving and a possible domestic disturbance. Ms. Gomez and Defendant chuckled and Defendant said that he had been asleep prior to the stop. Defendant told Detective Corral they were coming back from Portland. Detective Corral then asked Ms. Gomez to step out of the vehicle so they could talk. Defendant remained in the car, while Sergeant Warren stood by the front passenger window. Detective Corral asked Ms. Gomez how she knew Defendant, how long they had been dating, where she worked, what they were doing in Portland, and whether they stayed. He also asked if Defendant had ever assaulted her or she knew of any warrants out for her or him. Detective Corral ran Ms. Gomez's information and told her she was "good to go," but continued to question her about the trip to Portland.

Detective Corral then walked back to the car and instructed Defendant to get out of the vehicle. Detective Corral questioned Defendant about his relationship with Ms. Gomez and their trip to Portland. Detective Corral then told Defendant and Ms. Gomez that they were being detained, and Sergeant Warrant handcuffed both of them. Detective Corral told Defendant that, because he saw signs of

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS * 8**

"something else going on," he was going to conduct a drug investigation with his K9 drug sniffing dog, Ezra. Detective Corral gave Defendant his *Miranda* warning and continued to question him. Detective Corral asked Defendant whether he owned any other cars, and he responded that he has a truck "but it has a breathalyzer." Detective Corral and Sergeant Warrant continued to detain Defendant and Ms. Gomez separately on the side of the road. Ms. Gomez said nothing as Detective Corral repeatedly asked her whether there was anything in the car and that he would hate to see her take the rap for something Defendant was doing. Defendant was then placed in the back of a patrol car.

At around 3:30 p.m., Detective Corral applied Ezra to the exterior of the Chrysler 300 rental vehicle. Although there is conflicting information between the report and the dash cam footage, Detective Corral applied Ezra to the car starting at the rear passenger side of the vehicle. Detective Corral's report says he observed Ezra start to exhibit changes of behavior that would indicate the presence of the odor of narcotics as they passed counterclockwise around the vehicle. Ezra started to sniff the rear driver's side of the vehicle, then pulled back towards the front driver's side door. Her mouth closed and her sniffing and breathing became rapid and shallow. She then sniffed the driver's side door handle and seam area, and then gave a final alert by sitting. Detective Corral then walked Ezra away and reapplied her to the driver-side door area. She again exhibited the same change of behavior in the same area and gave the same final alert by sitting. Defendant and Ms. Gomez were detained and transported to the Pasco Police Department station for further questioning. The vehicle was also impounded and transferred to the station.

Meanwhile, at around 3:15 p.m., after the traffic stop discussed above, SA Deitering assisted by member of the Tri-City Metro Task Force and Kennewick Police Department served the search warrant at Defendant's residence. No one was found inside the residence at the time the warrant was executed. During the search, SA Deitering found and seized approximately 150 pills suspected to contain

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS * 9**

fentanyl, packaging materials, and several items of dominion containing Defendant's names, several cell phones, a vehicle, and an undetermined amount of bundled cash.

Detective Corral applied for and was granted a warrant to search the vehicle at approximately 5:12 p.m. The search warrant declaration was offered by SA Deitering and Detective Corral, and contained information from the CD-1 and CD-2 interviews in 2018; Defendant's gambling records and employment records; the Snapchat investigation; the GPS phone ping warrant information; information from the Mikey Vantiger February 6 Facebook post; and surveillance of Defendant being picked up by Ms. Gomez on February 8 in the Chrysler 300. The application also detailed Detective Corral's stop of the vehicle, questioning on scene, application of Ezra, and her alleged alert. The warrant authorized the search of the vehicle for evidence of crimes of controlled substances, drug paraphernalia, dominion, U.S. currency, and Defendant's cell phone. The search warrant was executed at 5:25 p.m. and uncovered 53,000 suspected fentanyl pills.

While the vehicle was being searched, Defendant and Ms. Gomez were held in interrogation rooms at the police station. After the search revealed the suspected fentanyl pills, officers began to interview Defendant at around 6:00 p.m. Defendant was not read his *Miranda* rights until approximately 6:08 p.m. and after, it appears, he was told what was discovered in the rental car. Defendant then waived his *Miranda* rights and explained the trips and the pills. Defendant described himself to investigators as a "load driver" and stated that, during the last five months, he had been traveling to southern California once a month to pick up drugs for $5,000 per trip. He said he did not know the name of the person from whom he had picked up the package suspected to contain fentanyl, but that it was the same person as previous trips and that he had picked up the package at the La Quinta Inn Hotel in Hesperia, California. He also stated that he knew the package contained drugs but did not know what kind. Defendant also claimed that he did not know the name of

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS \* 10**

the person to whom he was supposed to deliver the package, and that Ms. Gomez was only a driver and did not know any of the individuals involved. The interview concluded at around 7:00 p.m. and Defendant was transported and booked into Benton County Jail.

Defendant was charged by criminal complaint on February 11, 2020. He is charged with one count of Possession with Intent to Distribute 400 Grams or More of Fentanyl in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(vii).

## Legal Standard

The Fourth Amendment prohibits unreasonable, warrantless searches and seizures of one's person or their effects. Courts have repeatedly recognized that a traffic stop is a seizure within the meaning of the Fourth Amendment. *Arvizu v. United States*, 534 U.S. 266, 273 (2002). If the stop is done to investigate criminal activity, the stop must be supported by reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1, 29 (1968); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (extending *Terry* to vehicle stops).

Reasonable suspicion requires "specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal activity." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000). A hunch or unparticularized suspicion is insufficient to satisfy reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). However, reasonable suspicion is not a standard of legal technicians; instead, what matters are the "factual and practical considerations of everyday life on which reasonable and prudent men . . . act." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020). The level of suspicion required by the reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence and is less than that required for probable cause. *Navarette v. California*, 572 U.S. 393, 397 (2014). Thus, reasonable suspicion allows officers to make common

ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS * 11

sense judgments and inferences about human behavior, but they need not rule out the possibility of innocent conduct. *Id.*

When assessing the reasonableness of a traffic stop, courts consider what is being investigated or accomplished by detaining the individual. *United States v. Hensley*, 469 U.S. 221, 229 (1985); *United States v. Grigg*, 498 F.3d 1070, 1083 (9th Cir. 2007). This determination is based on a totality of the circumstances, including the nature of the offense, any inherent threat to public safety associated with the violation, and whether officers knew or reasonably believed they knew the identity of the person being detained. *Grigg*, 498 F.3d at 1080; *Christian*, 356 F.3d at 1105-07. Although stopping a car and detaining its occupants constitutes a seizure under the Fourth Amendment, the governmental interests in investigating an officer's reasonable suspicion may outweigh the individuals' Fourth Amendment interests in remaining secure from government intrusion. *Hensley*, 469 U.S. at 226.

The exclusionary rule bars the prosecution from using evidence that was obtained through a violation of the Fourth Amendment. *United States v. Shetler*, 665 F.3d 1150, 1156 (9th Cir. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). Evidence seized or statements made during an unlawful search or seizure "should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *New York v. Harris*, 495 U.S. 14, 19 (1990). In general, where a defendant makes statements of a confession after being confronted with seeming evidence of guilt in the course of an illegal search or seizure, those statements bear a sufficiently close relationship to the underlying illegality. *Shetler*, 665 F.3d at 1157-60; *United States v. Davis*, 332 F.3d 1163, 1171 (9th Cir. 2003). The exclusionary rule further applies to derivative evidence that was acquired as an indirect result of an unlawful search and seizure. *Murray v. United States*, 487 U.S. 533, 536 (1987).

//

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS \* 12**

**Discussion**

Defendant's motion as filed raises a number of issues implicating the validity of the stop and search of the Chrysler 300 Defendant was traveling in on February 10, 2020. Pursuant to the parties' agreement at the hearing, the Court only considers two issues now: (1) whether there was reasonable suspicion to support the February 10 investigative stop and (2) whether the use of a ruse as a means to execute that stop was unreasonable under the Fourth Amendment. For the reasons discussed herein, the Court finds that the stop was supported by reasonable suspicion and that the use of the ruse—while unnecessarily complicating what would have otherwise been a relatively straightforward drug trafficking case—was not unreasonable, and therefore denies the motion.

1. <u>The Officers Had Reasonable Suspicion to Support the February 10 Traffic Stop</u>

The Government argues that there was reasonable suspicion to stop the Chrysler 300 Defendant was travelling in on February 10, 2020. It argues that, as discussed above, there was significant evidence Defendant was engaged in ongoing criminal activity and that the Court should be guided by the fact that at least three other neutral magistrates issued search warrants on the basis of those facts. It also points to the collective knowledge doctrine to argue the Court should attribute all knowledge about the investigation to the officers who actually stopped Defendant. Defendant argues that there was no reasonable suspicion to support the traffic stop because the officers relied on the interviews with CD-1 and CD-2, which he argues is stale evidence. He argues that if that stale evidence is discounted, then the officers only stopped the car he was riding in on a hunch that he might be in it.

Under the collective knowledge doctrine, courts consider whether an investigatory stop complied with the Fourth Amendment by "'look[ing] to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS \***
13

the investigation is not communicated to the officer who actually [undertakes the challenged action].'" *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (quoting *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986)). The doctrine applies, *inter alia*, when an officer or team of officers with direct personal knowledge of all the facts necessary to give rise to a reasonable suspicion directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest. *Id.* at 1032-33.

Under the staleness doctrine, evidence that is too old cannot be used in support of a determination of probable cause or reasonable suspicion. However, the mere lapse of substantial amounts of time on its own is not controlling. *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988). Staleness must be evaluated in light of the particular facts of the case and the nature of the criminal activity at issue. *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991). Passage of time is less determinative of staleness in some crimes, such as those that involve an ongoing, continuous pattern or course of conduct like drug trafficking. *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993). Thus, in some cases, lapses of months or even years will not render a determination of cause stale. *Id.* at 1369-70.

The Court finds that there was reasonable suspicion to stop the car Defendant was travelling in on February 10, 2020. The Court considered the following facts: (1) the Sprint subpoena records, which showed frequent quick-turnaround trips between the Tri-cities and southern California; (2) the GPS phone ping data, which tracked the movement of Defendant's cell phone from the Tri-cities area down to California and back between February 8 and February 10, 2020; (3) the gambling records, employment records, and Snapchat data, which suggested that Defendant had access to large amounts of cash without any apparent source; (4) the February 8 Facebook post seeking a driver to accompany Defendant on a weekend trip; and (5) visual surveillance of Defendant's home, including visual confirmation that Defendant was a passenger in a white Chrysler 300 driven

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS \* 14**

by a Latina woman and confirmation that the particular vehicle had a certain license plate and was owned by a rental company. Even if the interviews of CD-1 and CD-2 were stale, based on the officers' training this would be enough information to support a reasonable suspicion that Defendant was engaged in criminal activity as he returned back to the Tri-cities area. However, the Court is not convinced that the interviews of CD-1 and CD-2 are in fact stale, as they were evidence of ongoing criminal activity and not a one-off incident. Furthermore, Detective Corral had sufficient personal information, on the basis of the collective knowledge doctrine, to execute this stop on behalf of the DEA agents involved in this case. He was briefed by other officers and agents involved in the investigation and was asked to conduct the stop of the Chrysler 300 on February 10 as it returned to the Tri-cities region. The Court therefore concludes that there was sufficient reasonable suspicion to stop the Chrysler 300 on February 10, 2020 for the purposes of investigating whether Defendant was in the vehicle and whether he was engaged in drug trafficking.

2. <u>The Use of a Ruse was not Unreasonable under the Fourth Amendment</u>

Defendant argues that—even assuming that the initial stop was supported by reasonable suspicion—the use of a ruse as pretext for the traffic stop as unreasonable under the Fourth Amendment. He argues that Detective Corral lied about his purpose in stopping them on February 10 and the scope of his investigation in order to get him and Ms. Gomez to let down their guard and speak freely with him. In response, the Government argues that Detective Corral was justified in his use of a ruse in order to protect the ongoing investigation and prevent Defendant from potentially tipping off others about law enforcement activity.

An otherwise lawful search or seizure can violate the Fourth Amendment if it is executed in an unreasonable manner. *United States v. Ramirez*, 976 F.3d 946, 952 (9th Cir. 2020) (citing *United States v. Alverez-Tejeda*, 491 F.3d 1013, 1016

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS \* 15**

(9th Cir. 2007)). This includes if the seizure is executed by means of an unreasonable ruse. *Id.* at 1016-17. Law enforcement may use deceit in certain circumstances, although not every ruse is reasonable under the Fourth Amendment. *See Lewis v. United States*, 385 U.S. 206, 209 (1966). For example, courts have long recognized that officers may lie when executing an investigatory traffic stop, and the use of a lie cannot undo the objective existence of reasonable suspicion or probable cause. *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) (citing *Whren v. United States*, 517 U.S. 806, 812-13) (1996)). Law enforcement may also conceal their identity to facilitate a search or seizure within their lawful authority. *Ramirez*, 976 F.3d at 953. However, courts "take a close look" when law enforcement identify themselves but mislead suspects as to the scope, nature, or purpose of the investigation. *Id.* at 954; *Alverez-Tejeda*, 491 F.3d at 1017. When such a ruse is used, the court must assess the reasonableness of law enforcement use of a ruse by "balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Jacobsen*, 466 U.S. 109, 124 (1984); *Alvarez-Tejeda*, 491 F.3d at 1016.

Defendant argues that because law enforcement lied about the purpose of the investigatory stop on February 10 by saying the stop was because of reports of erratic driving and possible domestic disturbance, the ruse is unreasonable and unlawful under the Fourth Amendment. He argues that the ruse led him and Ms. Gomez to speak openly with Detective Corral in order to dispel suspicion that there was any domestic disturbance. He argues that Detective Corral betrayed his trust by using this ruse. Defendant relies on *United States v. Ramirez*, 976 F.3d 946, a newly decided case from the Ninth Circuit. The Government argues that *Ramirez* is inapposite to the facts at hand because Detective Corral did not misrepresent which agency he represented or lure Defendant to another location where he would have more authority. It also argues that—as the Assistant United States Attorney put it

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS \* 16**

in oral argument—Defendant cannot turn "a prince into a frog" by pointing to the ruse to undo the objective reasonable suspicion that existed to stop his vehicle on February 10.

In *Ramirez*, FBI agents were investigating allegations that someone at a particular residence was downloading child pornography. The agents had a search warrant for a suspect's residence, as well as the suspect's vehicle if it was near the residence at the time of the execution of the search warrant. The suspect and his vehicle were not home at the time the agents wanted to execute the search warrant. The agents then decided to call the suspect, say they were local police officers, and that they were responding to reports of a burglary at this home; they asked him to come home. The agents also enlisted the suspect's mother—who was the owner of the residence—and his former roommate to help lure him home. Once the suspect came home, the officers then executed the warrant to search the residence and his vehicle. The Court ruled that the agents' use of a ruse was unreasonable and ordered suppression of evidence seized and statements made because the agents lied about their identities, lied about the purpose of their investigation, and their purported justifications for the ruse did not outweigh the suspect's Fourth Amendment interest. *Ramirez*, 976 F.3d at 957.

The Court notes that this is a closer issue. Detective Corral did not need to use a ruse to justify the investigatory stop here, and by doing so unnecessarily added a complicated wrinkle to the analysis of the stop. However, the rule that law enforcement may lie to a suspect about the reason for a traffic stop without implicating the legality of the stop itself has not been overruled. That Detective Corral had no reasonable suspicion to justify a traffic stop for erratic driving or domestic disturbance is irrelevant under currently controlling precedent because he did have reasonable suspicion to stop the Chrysler 300 on suspicion of drug trafficking. *See Whren*, 517 U.S. at 812-13. Indeed, the Ninth Circuit has expressly stated "[s]o long as the facts known to the officer establish reasonable suspicion to

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS * 17**

justify an investigatory stop, the stop is lawful even if the officer falsely cites as the basis for the stop a ground that is not supported by reasonable suspicion." *Magallon-Lopez*, 817 F.3d at 675. The objective facts supporting reasonable suspicion—not what the officer said or was thinking—are what matters. *Id*. The objective facts supporting the stop were known to Detective Corral, as discussed above. As *Magallon-Lopez* has not been overruled by *Ramirez*, the Court declines to find that Detective Corral's use of a ruse here was unreasonable under the Fourth Amendment. The motion is therefore denied on the ground that the ruse was not unreasonable under the Fourth Amendment.

Accordingly, **IT IS HEREBY ORDERED:**

1. Defendant's Motion to Suppress, ECF No. 76, is **DENIED in part**. The Court reserves ruling on Defendant's arguments as to the reliability of the K9 drug dog alert, the validity of the search warrant, and the ultimate question of suppression on those bases.

2. A status conference is **set** for **March 22, 2021** at **9:00 a.m.** via videoconference.

**IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this 10th day of March 2021.



Stanley A. Bastian
Chief United States District Judge

**ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS** *
18